**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| **ROBERT W. STEGMAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 2:10CV00058 LMB** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Robert W. Stegman for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case

has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice

Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has

filed a Brief in Support of the Complaint. (Document Number 15). Defendant has filed a Brief in

Support of the Administrative Decision and in Reply to Plaintiff's Brief. (Doc. No. 19).

## Procedural History

On January 19, 2007, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on April 4, 2004. (Tr. 87, 81). Plaintiff's

applications were denied initially. (Tr. 44-50). On March 11, 2009, following an administrative

hearing, an Administrative Law Judge (ALJ) found that plaintiff was not disabled prior to January

1, 2009, but he became disabled as of that date. (Tr. 6-20). Plaintiff then filed a request for

review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on July 8, 2010. (Tr. 5, 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on February 3, 2009. (Tr. 23). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Dr. John F. McGowan. (Id.).

Plaintiff's attorney made an opening statement, during which he argued that since April of 2004, plaintiff has been unable to engage in any substantial gainful activity due to the residuals of his severe injuries to his right hip and his left ankle, and low back pain. (Tr. 24). Plaintiff's attorney stated that plaintiff suffers from many painful conditions and experiences swelling in his left ankle. (Id.). Plaintiff's attorney argued that plaintiff is unable to work in any position for an entire day as a result of his conditions. (Id.). Plaintiff's attorney stated that plaintiff has received all of his treatment at the Veteran's Hospital, and that the physicians there do not evaluate patients' ability to work. (Id.). Plaintiff's attorney noted that plaintiff recently underwent a consultative examination. (Id.).

The ALJ then examined plaintiff, who testified that he would be forty-nine years of age two days after the hearing. (Id.). Plaintiff stated that he was divorced and that he lived alone in a house that he owns. (Id.). Plaintiff testified that he completed the twelfth grade. (Tr. 25). Plaintiff stated that he was five-feet, six-inches tall and weighed 170 pounds. (Id.). Plaintiff testified that he served in the Navy from 1978 through 1984 and that he received an honorable

discharge.  (Id.).

Plaintiff stated that he received no income at the time of the hearing.  (Id.).  Plaintiff testified that he relies on assistance from his parents and friends.  (Id.).  Plaintiff stated that he receives food stamps in the amount of $165.00 a month.  (Tr. 26).  Plaintiff testified that he receives medical care through the Veteran's Administration ("VA").  Plaintiff stated that he does not receive Medicaid benefits.  (Id.).

Plaintiff testified that he claimed April 4, 2004 as his disability onset date because he was unable to perform his job at that time.  (Id.).  Plaintiff stated that the accident occurred in 1995.  (Id.).  Plaintiff testified that he was working for the City of Moberly on April 4, 2004.  (Id.).  Plaintiff stated that he worked on the back of a trash truck at this position.  (Id.).  Plaintiff testified that he had to lift trash cans at this position and that it was a heavy job.  (Tr. 26-27).

Plaintiff stated that he did not believe he was capable of working at a sit-down position at the time of the hearing because he experienced discomfort when stationary.  (Tr. 27).  Plaintiff testified that he has never had a sit-down job.  (Id.).

Plaintiff stated that he spends his time watching television and trying to stay comfortable.  (Id.).  Plaintiff testified that he constantly alternates positions to stay comfortable.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he was eligible for treatment at the VA based on his service record in the Persian Gulf.  (Id.).  Plaintiff stated that he was on the aircraft carrier USS Kitty Hawk.  (Id.).

Plaintiff testified that he received the injury to his right hip as a result of a head-on collision that occurred in 1995.  (Tr. 28).  Plaintiff stated that he also has a problem with his left ankle.  (Id.).  Plaintiff testified that he underwent two fusion surgeries on his left ankle and his

doctors have recommended a third surgery. (Id.). Plaintiff stated that he does not want to undergo a third fusion surgery because he believes this would further decrease the flexibility in his ankle. (Id.).

Plaintiff testified that, since April of 2004, he has been able to stand for about thirty minutes before his left ankle starts swelling and he has to take off his shoe. (Tr. 29). Plaintiff stated that he is able to sit for thirty to forty-five minutes before the screw in his right hip starts poking him. (Id.). Plaintiff testified that he is able to walk for about half of a block before he has to rest because his ankle swells. (Id.).

Plaintiff stated that, during an average day, he has to elevate his left ankle on the coffee table. (Tr. 30). Plaintiff testified that he spends about a third of his waking time reclining and elevating his left leg on the coffee table. (Id.). Plaintiff stated that he has to elevate his left ankle for about forty-five minutes for the swelling to go down. (Id.).

Plaintiff testified that he takes medications prescribed by the VA. (Id.). Plaintiff stated that he takes pain relievers and anti-inflammatories to treat the pain and swelling in his right hip and left ankle. (Id.).

Plaintiff testified that he is unable to sleep through the night. (Id.). Plaintiff stated that he wakes up every three hours. (Id.). Plaintiff testified that he sleeps about four hours in an average night. (Tr. 31). Plaintiff stated that he never feels rested during the day and that he occasionally naps. (Id.). Plaintiff testified that he naps once or twice a day if he can. (Id.).

Plaintiff stated that he has received some income, less than one thousand dollars, from consulting with a friend, Randy, that is a landscaper. (Id.). Plaintiff testified that Randy asked plaintiff's advice regarding fertilization and seeding due to plaintiff's experience working at a golf

course.  (Id.).  Plaintiff stated that he gave Randy his opinion and Randy paid him for the information.  (Id.).  Plaintiff testified that he received less than one thousand dollars in 2008 for consulting with Randy.  (Tr. 32).

Plaintiff stated that he performed greens maintenance at a golf course from 1992 to 1999. (Id.).  Plaintiff testified that he would be unable to perform this position at the time of the hearing because it involved a lot of bending and lifting.  (Id.).

Plaintiff stated that he receives treatment at the VA hospital about once a month for pain management.  (Id.).

Plaintiff testified that his right hip was fractured in a car accident that occurred in 1995. (Id.).  Plaintiff stated that the right hip and right femur were totally fractured and that the femur bone was hanging out of his leg.  (Tr. 33).

Plaintiff testified that his left ankle was fractured in 1996, when his own truck rolled over his left foot.  (Id.).  Plaintiff stated that he accidentally placed his truck into neutral when it was parked on a hill and the truck ran over his foot and dragged him down the hill.  (Id.).  Plaintiff testified that he underwent ankle surgery during which they put plates and screws in his ankle to put it back together.  (Tr. 34).

Plaintiff stated that he was not able to perform any job on a full-time basis because no employer would tolerate his constantly changing positions and elevating his foot on a counter. (Id.).  Plaintiff testified that he would be unable to work at a sit-down job due to the pain and the medication he takes.  (Id.).

The ALJ then re-examined plaintiff, who testified that he earned $30,000.00 in 1988, $10,000.00 in 1989, and $3,000.00 in 1990.  (Id.).  Plaintiff stated that he received $30,000.00 in

1988 because he had a good job at the post office in Michigan. (Tr. 35). Plaintiff testified that he left this position and moved to Arkansas because he met someone and got married. (Id.). Plaintiff stated that he planned to transfer to a position in Arkansas but it did not work out. (Id.).

Plaintiff stated that he had one child, a son who was nine years of age. (Id.). Plaintiff testified that he was not paying child support and that he did not have any problems with the State for failure to pay child support. (Id.). Plaintiff stated that his son lived in Florida with his mother and that he had little contact with him. (Id.).

The ALJ then examined Dr. McGowan, who testified that plaintiff's position as a greens keeper was classified as medium. (Tr. 36). Dr. McGowan stated that the position requires a great deal of knowledge regarding things such as fertilizers. (Id.). Dr. McGowan testified that there would be limited transferability of skills. (Id.).

Dr. McGowan stated that plaintiff's work for the City of Moberly was classified as maintenance worker, municipal. (Id.). Dr. McGowan testified that this position was heavy in exertion. (Id.).

The ALJ asked Dr. McGowan to assume a hypothetical claimant of plaintiff's age, education, and work experience, with the following limitations: can occasionally and frequently lift and carry ten pounds; stand and walk about two hours in an eight-hour day; sit about six hours in an eight-hour day; after thirty minutes of continuous sitting, must stand for five to ten minutes before resuming sitting; and is able to walk and stand for no more than twenty minutes at a time. (Id.). Dr. McGowan testified that such an individual would be unable to perform plaintiff's past work. (Tr. 38). Dr. McGowan stated that plaintiff has no transferable skills. (Id.). Dr. McGowan testified that the individual would be capable of performing sedentary unskilled work

as a security surveillance systems monitor (2,000 such positions in Missouri; 100,000 positions nationally); and information clerk (200 positions in Missouri; 16,000 positions nationally). Dr. McGowan noted that this was a rather restrictive hypothetical. (Id.). Dr. McGowan stated that the figure he provided for security surveillance systems monitor positions in Missouri was low in his opinion, and that it was not up-to-date. (Tr. 39). Dr. McGowan testified that retail stores are using this position more frequently now. (Id.).

The ALJ then asked Dr. McGowan to assume the additional limitation of a need to elevate one of the legs at coffee table height for forty-five minutes over the course of a workday. (Id.). Dr. McGowan testified that this limitation would eliminate the jobs he discussed. (Id.).

Plaintiff's attorney then examined Dr. McGowan, who testified that the jobs he discussed would not require climbing, balancing, kneeling, or crouching. (Tr. 40). Dr. McGowan stated that the positions might require some moderate or light bending over to pick things up off a desk. (Id.).

Plaintiff's attorney asked Dr. McGowan to add the following limitation to the ALJ's second hypothetical: the need to be in reclining position one to three times a day for up to thirty minutes and to prop both legs one to three feet one to three times a day while sitting. (Id.). Dr. McGowan testified that the individual would not be able to perform the positions he discussed. (Tr. 41).

Plaintiff's attorney then asked Dr. McGowan to assume plaintiff's testimony that he must recline or elevate his left leg at least a third of the day. (Id.). Dr. McGowan testified that this would preclude all competitive work. (Id.).

**B. Relevant Medical Records**

The record reveals that plaintiff presented to the VA Medical Center ("VAMC") in Columbia, Missouri on June 7, 2005, with complaints of left ankle pain and right hip pain that had gradually been worsening over the past two years. (Tr. 154). It was noted that plaintiff had fractured his right femur as a result of a motor vehicle accident in 1995 and that his left ankle was run over in 1996, resulting in ankle surgery. (Id.). Upon examination, plaintiff had good range of motion of the right hip and left ankle. (Tr. 155). The impression of John A. Zimmerschied was traumatic arthritis.[1] (Id.). Dr. Zimmerschied recommended that plaintiff try over-the-counter ibuprofen for pain. (Id.). Plaintiff underwent x-rays of the left ankle, which revealed old post-traumatic and post-surgical changes at the ankle. (Tr. 157). X-rays of the hip revealed old post-traumatic changes and postoperative metallic fixation of comminuted fracture of the proximal femur. (Tr. 157).

Plaintiff presented to the VAMC on July 14, 2005, with complaints of left ankle swelling and pain with activity and right hip and groin pain with activity. (Tr. 152). Upon examination, plaintiff's ankle was tender to palpation. (Id.). Plaintiff underwent x-rays of the left ankle, which revealed a malunion of the fibula and some osteoarthritis.[2] (Tr. 153). X-rays of the right hip revealed osteoarthritis. (Id.). Raj V. Kakarlapudi, M.D. indicated that he discussed the malunion of plaintiff's ankle with plaintiff and the options of either doing a realignment or a fusion to relieve the pain. (Id.). Plaintiff expressed concern that the proximal screw in his right hip was bothering him. (Id.). Dr.

---

[1]The inflammation of joints due to trauma. See Stedman's Medical Dictionary, 159 (28th Ed. 2006).

[2]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

Kakarlapudi indicated that there was a risk of breaking the screw while attempting to removing it. (Id.).

Plaintiff presented to the emergency room at the VAMC on September 6, 2005, with complaints of increased right lower quadrant pain. (Tr. 194). Plaintiff underwent a CT scan and ultrasound, which were consistent with a diagnosis of cholelithiasis.[3] (Tr. 181). Plaintiff was diagnosed with acute cholecystitis[4] on September 8, 2005. (Tr. 172). Plaintiff was scheduled for a laparoscopic cholecystectomy.[5] (Id.). Plaintiff was discharged on September 9, 2005, with diagnoses of cholelithiasis. (Tr. 162).

Plaintiff underwent an outpatient laparoscopic cholecystectomy on September 14, 2005. (Tr. 206-19). Plaintiff's post-operative diagnosis was symptomatic cholelithiasis. (Tr. 214).

On March 15, 2007, plaintiff saw Craig S. Heligman, MS, MD, for a consultative examination at the request of the state agency. (Tr. 225-30). Plaintiff complained of right shoulder pain, right hip pain, lower back pain, and left ankle pain. (Tr. 224). Plaintiff stated that he took aspirin and Aleve daily to relive his pain. (Tr. 226). Upon physical examination, plaintiff showed no evidence of discomfort while seated in a chair or on the examination table, was able to sit without fidgeting or changing position, and was able to undress and dress without assistance. (Id.). Plaintiff had an antalgic gait and walked with a wide-base reciprocal gait pattern. (Id.). Dr. Heligman noted that plaintiff had reduced range of motion evident in the right hip and left ankle consistent with plaintiff's history of reported injuries and treatment. (Tr. 230). Dr. Heligman found that plaintiff's reports of

[3]Presence of concretions in the gallbladder. Stedman's at 366.

[4]Inflammation of the gallbladder. Stedman's at 364.

[5]Surgical removal of the gallbladder. Stedman's at 365.

pain were consistent with what one would expect based upon clinical findings. (Tr. 229). Dr. Heligman diagnosed plaintiff with status post fracture and open reduction, internal fixation right hip/femur; status post fracture and open reduction, internal fixation left ankle; muscular atrophy left calf; 2 cm leg length discrepancy right leg; status post AC separation; and status post cholecystectomy. (Id.). Dr. Heligman expressed the opinion that plaintiff would be able to sit, stand and walk as needed to perform sedentary work, and that he would be able to lift and carry up to twenty pounds. (Tr. 230). Dr. Heligman found no evidence of impaired function of the upper extremities and no gross evidence of visual or hearing deficits. (Id.). Finally, Dr. Heligman noted that plaintiff would not be limited from traveling. (Id.).

Plaintiff presented to the VAMC on June 27, 2007, with complaints of chronic arthritis pain. (Tr. 244). It was noted that plaintiff had last been seen two years prior, and that he did not keep follow-up appointments. (Id.). It was also noted that plaintiff indicated that he did not want any further surgical procedures. (Id.). John A. Zimmerschied, Staff Physician, diagnosed plaintiff with traumatic arthritis. (Tr. 245). Dr. Zimmerschied prescribed Tramadol.[6] (Id.).

Plaintiff presented to the VAMC on October 26, 2007, at which time he complained of lower back pain, which he attributed to his leg length discrepancy; and neuropathic pain in the left ankle. (Tr. 254-55). Dr. Zimmerschied diagnosed plaintiff with traumatic arthritis. (Tr. 256). He continued

_____

[6]Tramadol is an analgesic indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See Physician's Desk Reference (PDR), 2428-29 (63rd Ed. 2009).

the Tramadol for general pain, started Gabapentin[7] for neuropathic pain, and Flexeril[8] for low back pain and muscle spasm. (Id.).

Plaintiff presented to the VAMC on April 29, 2008, with complaints of left ankle pain and low back pain. (Tr. 249). Upon physical examination, plaintiff had full range of motion in the lower extremities, and a smooth and symmetrical wide-based gait. (Tr. 250). Plaintiff was able to heel and toe walk without difficulty, and was able to forward bend to toes. (Id.). Plaintiff's left leg was found to be 1/8 inch short. (Id.). The assessment of Jason Garth Anderson, Resident Physician, was low back pain, left ankle pain status post injury/surgery, right hip pain status post surgery, somatic dysfunction pelvis, and leg length discrepancy-short on left. (Id.). Dr. Anderson performed manual manipulation of the pelvis, gave plaintiff a 1/8 left heel lift, and advised plaintiff to continue daily activity and exercise. (Id.).

Plaintiff presented to the VAMC on September 12, 2008, with complaints of chronic pain, which he rated as a four on a scale of one to ten. (Tr. 258-59). Plaintiff reported that his dog ate the lift he was given for his right leg. (Tr. 258). Upon physical examination, plaintiff had full range of motion in the left lower extremity with some slight decrease in external rotation of the right hip. (Tr. 259). Plaintiff's gait was smooth and symmetrical. (Id.). Plaintiff was able to heel and toe walk, squat, and forward bend to the ankles without difficulty. (Id.). Plaintiff had no tenderness to palpation and good range of motion of the left ankle. (Id.). Plaintiff had no pain with movement or compression of the left ankle. (Id.). Dr. Zimmerschied indicated that a lift was not required. (Tr.

---

[7]Gabapentin is indicated for the treatment of nerve pain. See WebMD, http://www.webmd.com/drugs (last visited September 20, 2011).

[8]Flexeril is a muscle relaxer indicated for the treatment of muscle spasms. See WebMD, http://www.webmd.com/drugs (last visited September 20, 2011).

260). He prescribed a cane for plaintiff's left hand and taught him some exercises for the right gluteus medius. (Id.). Dr. Zimmerschied prescribed Tylenol for pain. (Id.).

Plaintiff presented to the VAMC on December 15, 2008, with complaints of chronic back, neck, shoulder, knee, and ankle pain. (Tr. 262). Plaintiff reported that the Tramadol and Gabapentin help. (Id.). Dr. Zimmerschied diagnosed plaintiff with traumatic arthritis and continued the Tramadol and Gabapentin. (Tr. 264).

Plaintiff presented to the emergency room at the VAMC on January 9, 2009, with complaints of bilateral low back pain. (Tr. 267). Plaintiff indicated that he gradually started experiencing increasing pain and stiffness after changing a tire two days prior. (Id.). Plaintiff also reported intermittent left leg pain but denied radiation of low back pain to his leg. (Tr. 268). Plaintiff underwent x-rays of the lumbosacral spine, which revealed degenerative changes of the spine somewhat slightly more than expected for plaintiff's age. (Tr. 266). Upon physical examination, plaintiff had mild tenderness to palpation of bilateral low back with palpable spasm and mild tenderness to palpation of the right hip. (Tr. 268). Plaintiff's back range of motion was significantly limited by pain and stiffness. (Id.). Jennifer Carole Jiang, Physician, diagnosed plaintiff with lumbar strain. (Id.). Dr. Jiang prescribed Naprosyn[9] and recommended the use of ice/heat and stretching. (Id.).

Plaintiff saw Gary W. LaMonda, MD, PhD, for a consultative examination on January 17, 2009. (Tr. 270-74). Plaintiff complained of a significant, chronic gait disorder and chronic back, left ankle, right knee, and right hip pain. (Tr. 271). Upon physical examination, plaintiff ambulated with

---

[9]Naprosyn is a non-steroidal anti-inflammatory drug indicated for the treatment of osteoarthritis. See PDR at 2632-33.

a smooth but crab-like gait and stance, during which he was bent slightly forward and appeared to rotate his body around his left hip and pelvis with each step. (Tr. 273). Plaintiff had a slight scoliosis[10] with concavity to the right, and diffuse paraspinous muscle spasm in the lumbar area. (Id.). Diffuse tenderness was noted in the right hip and right gluteal area. (Id.). Plaintiff had diminished range of motion of the right hip to eighty-five degrees of flexion, ninety degrees extension and only ten degrees of external and internal rotation. (Id.). Plaintiff's left ankle was partially fused with ten degrees of upward extension and fifteen degrees of downward extension from neutral. (Id.). Dr. LaMonda's impression was: end stage, post traumatic severe degenerative osteoarthritis of the right hip; severe end stage post traumatic arthritis of the left ankle with pain, swelling and neuropathy; degenerative osteoarthritis of the left knee to moderate degree; chronic progressive and painful low back pain, with symptoms strongly suggesting facet arthropathy[11] due to chronic gait abnormality; prior acromioclavicular dislocation of the right shoulder, stable; prior blunt head injury; and recent ex smoker, exam suggests chronic obstructive pulmonary disease.[12] (Tr. 273-74). Dr. LaMonda stated that, considering plaintiff's physical limitations, he would agree with the previous evaluation that he could perform sedentary activity. (Tr. 274). Dr. LaMonda stated that, however, if he were to take into consideration the "considerable amount of pain and suffering attendant upon the patient remaining in any given position for longer than 30 minutes, it is my opinion that he would have great difficulty being employable." (Id.).

Dr. LaMonda completed a Medical Source Statement-Physical on January 18, 2009. (Tr.

---

[10]Abnormal lateral and rotational curvature of the vertebral column. Stedman's at 1734.

[11]A disease of the facet joints. See Stedman's at 161.

[12]General term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed. Stedman's at 554.

276-78). Dr. LaMonda expressed the opinion that plaintiff could occasionally lift ten pounds; stand or walk for a total of three hours, and stand continuously for thirty minutes; sit a total of three hours, and sit continuously for thirty minutes; could never climb, balance, kneel, or crouch; and could occasionally stoop and bend. (Tr. 276-77). Dr. LaMonda stated that plaintiff was prone to falling, had a neuropathic[13] left foot, and that he should avoid heights and machinery. (Tr. 277). Dr. LaMonda noted that temperature was always a problem with a nerve injury. (Id.). Dr. LaMonda indicated that rest and frequent changes of position were necessary. (Tr. 278). Dr. LaMonda found that it was necessary for plaintiff to assume a reclining position for up to thirty minutes, one to three times a day; assume a supine position for up to thirty minutes, one to three times a day; and prop up his legs to a height of two to three feet, one to three times a day while sitting. (Tr. 278).

## The ALJ's Determination

The ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.   The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3.   Since the alleged onset date of disability, the claimant has had the following severe impairments: end stage, post traumatic degenerative osteoarthritis of the right hip; end stage post traumatic arthritis of the left ankle, with pain, swelling, and neuropathy; degenerative osteoarthritis of the left knee; and low back pain, with symptoms suggesting facet arthropathy (20 CFR 404.1520(c) and 416.920(c)).

4.   Since the alleged onset date of disability, the claimant has not had an impairment

---

[13]Disorder of the nervous system. Stedman's at 1313.

or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5.     After careful consideration of the entire record, the undersigned finds that, prior to January 1, 2009, the claimant had the residual functional capacity to do the following: occasionally and frequently lift and carry 10 pounds; stand/walk 2 hours in an 8-hour workday (with normal breaks); stand/walk no more than 20 minutes at one time; sit 6 hours in an 8-hour workday (with normal breaks); after 30 continuous minutes of sitting he needs to stand for 5 to 10 minutes before resuming sitting.

6.     After careful consideration of the entire record, the undersigned finds that, beginning on January 1, 2009, the claimant had the residual functional capacity to do the following: occasionally and frequently lift and carry 10 pounds; stand/walk 2 hours in an 8-hour workday (with normal breaks); stand/walk no more than 20 minutes at one time; sit 6 hours in an 8-hour workday (with normal breaks); after 30 continuous minutes of sitting he needs to stand for 5 to 10 minutes before resuming sitting.  At that time, however, it became necessary for him to elevate his leg to the height of a coffee table for 45 minutes in an 8-hour workday.

7.     Since the alleged onset date of disability, the claimant has been unable to perform past relevant work (20 CFR 404.1565 and 416.965).

8.     The claimant was born on February 6, 1960 and was 44 years old on the alleged disability onset date, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

9.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.    Due to the claimant's age, transferability of job skills is not material to the determination of disability prior to January 1, 2009.  Beginning on that date, the claimant has not been able to transfer any job skills to other occupations (20 CFR 404.1568 and 416.968).

11.    Prior to January 1, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there were a significant number of jobs in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12.    Beginning on January 1, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there are not a significant number of jobs in the national economy that the claimant could perform (20 CFR

404.1560(c), 404.1566, 416.960(c), and 416.966).

13.     The claimant was not disabled prior to January 1, 2009, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-19).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on September 28, 2006, the claimant has been disabled under sections 216(I) and 223(d) of the Social Security Act beginning on January 1, 2009.

Based on the application for supplemental security income protectively filed on January 19, 2007, the claimant has been disabled under section 1614(a)(3)(A) of the Social Security Act beginning on January 1, 2009.

(Tr. 19).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The

analysis required has been described as a "searching inquiry."  Id.

**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th

Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful

employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520,

416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically

severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).

To qualify as severe, the impairment must significantly limit the claimant's mental or physical

ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are

not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.     Plaintiff's Claims**

Plaintiff first argues that the ALJ's residual functional capacity assessment for the period prior to January 1, 2009 was not supported by any medical evidence. Plaintiff also argues that the ALJ erred in determining plaintiff's disability onset date. The undersigned will discuss plaintiff's claims in turn.

1.      **Residual Functional Capacity**

The ALJ made the following determination regarding plaintiff's residual functional

capacity prior to January 1, 2009:

> After careful consideration of the entire record, the undersigned finds that, prior to
> January 1, 2009, the claimant had the residual functional capacity to do the following:
> occasionally and frequently lift and carry 10 pounds; stand/walk 2 hours in an 8-hour
> workday (with normal breaks); stand/walk no more than 20 minutes at one time; sit 6
> hours in an 8-hour workday (with normal breaks); after 30 continuous minutes of sitting
> he needs to stand for 5 to 10 minutes before resuming sitting.

(Tr. 13).

The undersigned finds that the ALJ's residual functional capacity determination is

supported by substantial evidence. Determination of residual functional capacity is a medical

question and at least "some medical evidence 'must support the determination of the claimant's

[residual functional capacity] and the ALJ should obtain medical evidence that addresses the

claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th

Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of

residual functional capacity is "based on all the evidence in the record, including 'the medical

records, observations of treating physicians and others, and an individual's own description of his

limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v.

Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional

capacity, an ALJ may consider non-medical evidence, although the residual functional capacity

finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

In this case, the residual functional capacity formulated by the ALJ is supported by the

medical evidence. Plaintiff's records from the VAMC do not reveal the presence of a disabling

impairment prior to January 2009. On June 7, 2005, Dr. Zimmerschied at the VAMC found that

plaintiff had full strength and good range of motion of the right hip and left ankle. (Tr. 155). Dr. Zimmerschied diagnosed plaintiff with traumatic arthritis and recommended that he try over-the-counter ibuprofen for pain. (Id.). In April of 2008, Dr. Anderson at the VAMC found that plaintiff had full range of motion in the lower extremities. (Tr. 250). Plaintiff was able to heel and toe walk without difficulty, and was able to forward bend to his toes. (Id.). Dr. Anderson recommended that plaintiff continue daily activity and exercise. (Id.). In September of 2008, plaintiff had full range of motion in the left lower extremity with some slight decrease in external rotation of the right hip. (Tr. 259). Plaintiff was able to heel and toe walk, squat, and forward bend to the ankles without difficulty. (Id.). Plaintiff had no tenderness to palpation and good range of motion of the left ankle. (Id.). Plaintiff had no pain with movement or compression of the left ankle. (Id.).

The ALJ's residual functional capacity determination is also consistent with the findings of consultative examiner Dr. Heligman. Plaintiff saw Dr. Heligman on March 15, 2007, at the request of the state agency. (Tr. 225-30). Upon physical examination, plaintiff showed no evidence of discomfort while seated in a chair or on the examination table, was able to sit without fidgeting or changing position, and was able to undress and dress without assistance. (Id.). Plaintiff had an antalgic gait and walked with a wide-base reciprocal gait pattern. (Id.). Dr. Heligman noted that plaintiff had reduced range of motion evident in the right hip and left ankle consistent with plaintiff's history of reported injures and treatment. (Tr. 230). Dr. Heligman expressed the opinion that plaintiff would be able to sit, stand and walk as needed to perform sedentary work, and that he would be able to lift and carry up to twenty pounds. (Tr. 230). Dr. Heligman found no evidence of impaired function of the upper extremities and no gross evidence

of visual or hearing deficits.  (Id.).

In determining plaintiff's residual functional capacity, the ALJ also performed a proper credibility analysis.  The ALJ pointed out that plaintiff received limited treatment from April 4, 2004, his alleged onset date, through January 1, 2009.  (Tr. 15).  This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability.  See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).  The ALJ also noted that there were significant gaps in plaintiff's treatment.  For example, plaintiff went for two years, from July 2005 to June 2007, without receiving treatment at the VAMC.  (Tr. 244).  In a treatment note from the VAMC dated June 27, 2007, Dr. Zimmerschied noted that plaintiff had last been seen two years prior and that he did not keep follow-up appointments.  (Tr. 244).  Dr. Zimmerschied further noted that plaintiff indicated that he did not want any further surgical procedures.  (Id.).

The ALJ also pointed out that plaintiff returned to work after his injuries and continued to work until 2006.  The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of a disabling impairment.  See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).  Plaintiff indicated in a SSA form that he worked as a greens keeper in 2005, and his earnings records reveals that he earned $4,189.53 in that year.  (Tr. 92, 116).  Plaintiff's ability to work on a part-time basis during the time in which he alleges he was disabled is inconsistent with plaintiff's allegation of disability and may demonstrate an ability to perform substantial gainful activity.  See 20 C.F.R. § 404.1571, 416.971; Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994).

After properly assessing plaintiff's residual functional capacity, the ALJ relied on

vocational testimony to determine that plaintiff could perform other work that existed in significant numbers in the national economy and he was, therefore, not disabled prior to January 1, 2009. (Tr. 18).

**2.        Disability Onset Date**

Plaintiff argues that the ALJ erred in inferring a disability onset date of January 1, 2009. Plaintiff contends that the ALJ provided no explanation for choosing this date. Plaintiff also contends that the ALJ should have consulted a medical expert regarding plaintiff's disability onset date.

Social Security Ruling 83-20 governs the determination of disability onset dates. <u>See</u> <u>Grebenick v. Chater</u>, 121 F.3d 1193, 1200-01 (8th Cir. 1997); 20 C.F.R. § 402.35(b)(1). Social Security Ruling 83-20 states that, for non-traumatic disabilities, "the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. The weight to be given any of the relevant evidence depends on the individual case." SSR 83-20, 1983 WL 3129 at *2; <u>See</u> <u>also</u> <u>Karlix v. Barnhart</u>, 457 F.3d 742, 747 (8th Cir. 2006).

The Ruling recognizes the difficulty in obtaining medical evidence establishing the precise date upon which a slowly progressive impairment becomes disabling. The Ruling thus permits the ALJ "to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." SSR 83-20, 1983 WL 31249 at *2. Such inference, however, must be made on an informed judgment of the facts in the particular case; and such judgment "must have a legitimate medical basis." <u>Id.</u> at *3. The assistance of a medical advisor is required, however, only in circumstances where the medical evidence of onset is ambiguous.

Grebenick, 121 F.3d at 1201.

In this case, the ALJ provided a sufficient explanation for finding plaintiff's disability began on January 1, 2009. The ALJ found that beginning on January 1, 2009, it became necessary for plaintiff to elevate his leg to the height of a coffee table for forty-five minutes in an eight-hour workday. (Tr. 16). This finding is based on the opinion of consultative examiner Dr. LaMonda, who examined plaintiff on January 17, 2009. (Tr. 270-74). Although Dr. LaMonda examined plaintiff and rendered his opinion on January 17, 2009, the ALJ clearly gave plaintiff the benefit of the doubt in determining that plaintiff's disability began on January 1, 2009.

The evidence in this case was unambiguous as to the onset date of plaintiff's disabling condition. Prior to January 1, 2009, none of plaintiff's treating or consulting physicians found that plaintiff was required to elevate his leg. As discussed previously, plaintiff received little treatment during this time and the medical evidence revealed that plaintiff's impairments were not disabling. As such, the ALJ did not err in failing to obtain the opinion of a medical advisor on the matter. Karlix, 457 F.3d at 747.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled prior to January 1, 2009, because the evidence of record does not support the presence of a disabling impairment during this time. The evidence of record does support the finding of the ALJ that plaintiff became disabled as of January 1, 2009. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this  29th  day of September, 2011.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE